IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2014

**IN RE CAMRYNE B.**

**Appeal from the Juvenile Court for Montgomery County**
**No. VTCV132031     Andrew Jackson, Judge**

_____

**No. M2014-00801-COA-R3-JV - Filed December 16, 2014**

_____

The trial court granted grandparent visitation based in large part on the asserted need to maintain a relationship between the grandchild and her half-sister (who had been adopted by grandmother).  Parents opposed the grandchild's visitation with her grandparents.  The trial court made no finding that cessation of the relationship between the grandparents and the grandchild presented a danger of substantial harm to the child.  In accordance with Tenn. Code Ann. § 36-6-306, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, and W. NEAL MCBRAYER, JJ., joined.

James R. Potter, Clarksville, Tennessee, for the appellants, Melisa I. and Andrew B.

Gregory D. Smith, Clarksville, Tennessee, for the appellees, Celeste and Albert B.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Melisa I. ("Mother") and Andrew B. ("Father") are the parents of Camryne B., born in November 2004.  Mother and Father were never married.  Father filed a petition for legitimation in October 2008, and the parties entered into an agreed permanent parenting plan establishing parenting time and child support. Celeste B. ("Grandmother") and Albert B. ("Grandfather"), (collectively "Grandparents"), are the paternal grandmother and paternal step-grandfather, respectively, of Camryne.  Mother had another child, Makenzie J., born in

June 2000, who was legally adopted by Grandmother in March 2013.

Grandmother and Grandfather had periods of visitation with Camryne until the summer of 2012. Disagreements and hostilities developed between Mother and Father and Grandmother, and Mother and Father decided that it was in Camryne's best interest not to have further visitation with Grandmother.

In May 2013, Grandparents filed a petition for grandparent and sibling visitation pursuant to Tenn. Code Ann. §§ 36-6-302 and 36-6-306. On September 26, 2013, the trial court entered an order by default in favor of Grandparents, finding that they had a "significant existing relationship with" Camryne and that it was "not in the best interest of the minor child to deny the visitation." The court went on to order that Grandparents have visitation with Camryne every third weekend from Friday to Sunday, one week during the summer, and one day during the Christmas season. The court also made provision for telephone contact and transportation.

The default order was set aside by the court on December 18, 2013, on a motion of Mother and Father. About a week later, Grandparents moved for contempt on the grounds that the court had ordered Mother and Father to continue visitation pursuant to the default order until the hearing set for February 28, 2014. The court entered an order on January 22, 2014, in which it clarified that "visitation would continue to take place pursuant to the Default order . . . until this matter could be heard on February 28, 2014."

The Hearing

Grandmother testified that she had stopped seeing Camryne in July or August of 2012. She thought that the reason she had not been seeing Camryne was that she "didn't like what [Father] and [Mother] were playing. Camryne spent most of her time down in Nashville with [her maternal grandmother], which I don't mind her being with [her maternal grandmother], but we were not getting any time with Camryne."

Grandmother stated that, before the visits stopped, she would see Camryne every day before school and after school until Mother got off of work. Before Camryne started to school, Grandmother testified, they would see her at least one weekend a month. Once she started school, Camryne would ride the bus to and from school from Grandmother's house with Makenzie. According to Grandmother, Makenzie and Camryne were very close.

Grandmother testified that she had not argued with either parent in front of Camryne. She stated that she did have concerns about Mother and Father's parenting of Camryne and Mother's failure to pay attention to Makenzie. Grandmother also had concerns about Mother's stability, stating that she had lived at twelve different addresses in fourteen years. Camryne had been in three schools in five years. Grandmother admitted spanking Makenzie

and grabbing her by the hair on one occasion, but denied beating her, slamming her head into the wall, or throwing her to the ground.

On cross-examination, Grandmother admitted telling Mother and Father in an e-mail sent on July 31, 2012, that Camryne could no longer be dropped off at her house for their convenience, that she would no longer be the drop-off point as contemplated in the parenting plan, and that she did not want to be put on the school contact list. Grandmother stated: "I wanted them to do their jobs as parents."

Grandmother also admitted that Makenzie took a multitool to school, which included a two-and-three-eighth-inch blade, and the school took issue with her having what they considered to be a knife at school. Grandmother further acknowledged that Makenzie set a curtain on fire.

Grandfather testified that the relationship between Camryne and Makenzie was a loving sister relationship. He had not seen Camryne in over two years. Grandfather was a civilian contractor working in Afghanistan; he had returned home for the trial.

Grandfather had never seen his wife physically abuse Makenzie. He had never witnessed any open hostility between Grandmother and Mother or Father in front of the children, and he had never heard Grandmother speak ill of Mother or Father in front of the children. He believed it was in the children's best interest to see Grandmother and to see him.

On cross-examination, Grandfather stated that, the last time he went overseas with the company he was currently working for, he was there for eighteen months. He had been in Afghanistan nine months this time and would probably be there until November 2014. Thus, he was away from the home for extended periods of time.

At this point, the court talked to Makenzie in chambers with the attorneys present.

The next witness in open court was Jamie De La Rosa, school resources officer at Cumberland Heights Elementary School. Officer De La Rosa described an incident that occurred around early October 2013; she was called by the school secretary because Grandmother was trying to see Camryne, but she was not on the emergency contact card. The officer escorted Grandmother out of the school, and Mother and Father entered the building at the same time.

Shaquanna Downs, a representative from the Department of Children's Services,

testified that she closed an investigation against Grandmother as unfounded.[1]

Dr. Bernard Ihrig, a psychologist, testified as an expert witness on behalf of Mother and Father. He performed a forensic evaluation of Camryne. He concluded: "She appears to be very psychologically healthy, stable. She actually seems quite happy, well adjusted, and functioning well psychologically." When asked whether, in his opinion, Camryne was "suffering serious or severe emotional harm," Dr. Ihrig responded, "No."

Father testified that he and Mother had never had a problem working together under the parenting plan to co-parent Camryne. When asked what caused the rift between him and Mother and Grandmother, Father stated that the "final straw that broke the camel's back was . . . late July 2012." Grandmother was upset about the pictures Mother put on Facebook of their vacation in Florida because they did not include pictures of Makenzie; according to Father, Grandmother responded by posting Mother and Father's arrest photos on Facebook. Father characterized Grandmother's behavior as disruptive to the family. He felt that she did not respect his parental rights.

Father testified that he and Mother had concerns about Makenzie's behavior at Grandmother's home. He stated that, in August of 2012, when he and Mother informed Grandmother that they did not want Camryne going over to Grandmother's home any more, Grandmother was "furious." He testified that he did not believe it was in Camryne's best interest to be going over to Grandmother's home. He stated that Grandmother "destroyed this relationship with all of us, and I told her I wasn't going to do it [go behind Mother's back to allow Grandmother to see Camryne]."

On cross-examination, Father acknowledged that Mother allowed Camryne to go to Grandmother's house during kindergarten and first grade. He further admitted that he understood that Grandmother was supposed to have visitation pending the hearing. He stated: "It's my obligation to protect my child, and if that puts me in contempt, then that puts me in contempt." Asked why he terminated the relationship between Camryne and Grandmother, Father stated: "I terminated the relationship because of the controversies that she would always stir up, as well as other reasons, because she would never respect my authority as a father to my child as well." He described Grandmother as "a malicious woman." On redirect, Father stated that he believed Grandmother was an emotionally unhealthy person.

The next witness was Mother's sister, Camryne's aunt ("Aunt"). Aunt testified that

---

[1]Mother and Father filed a petition for an order of protection against Grandmother, and this was reported to the Department of Children's Services.

she had not seen her niece Makenzie since around July [2012], after the Florida trip. Aunt was permitted to play a recording of a telephone conversation she had with Makenzie from May 2013. She testified that Makenzie had made statements to her about Grandmother hitting her. Aunt stated that Makenzie told her that Grandmother "beat her in the back." According to Aunt, there had been a few conversations over a period of a year or so in which Makenzie had been upset about what Grandmother was doing to her. Aunt last talked to Makenzie on August 10, 2013.

Mother testified about her concerns regarding Camryne being at Grandmother's home. She stated that she had witnessed Grandmother hitting Makenzie–for example, "smacking her in the mouth for talking back to her," taking "a back scratcher and hit[ting] Mackenzie . . . on the legs with it because she wouldn't do what [Grandmother] asked her to do." Mother stated that she had seen Grandmother grab Makenzie by the hair. If Mother tried to talk to Grandmother about the appropriateness of these behaviors, Grandmother would say "it's her rules and her way of parenting" and that Mother "gave up those rights when [she] gave up custody of Makenzie to [Grandmother]."

Mother, Father, and Mother's husband had discussions about their concerns about Camryne going over to Grandmother's house. They all "felt as though it was an unsafe environment and not in the best interest of Camryne to go over there any longer." As a result, in the summer of 2012, they notified Grandmother that Camryne would no longer be visiting Grandmother's house. In response, Grandmother sent an e-mail stating that she would be cutting all ties with them. At the time of the hearing, it had been a year and a half since Camryne had been to Grandmother's house. Mother testified that she was "a very happy little girl." She was involved in extracurricular activities and was doing "great" in school. Camryne had not had any behavior problems at school or at home. She had not asked about Grandmother.

## Trial Court's Decision

The trial court entered an order on April 7, 2014, in favor of Grandparents. The court made the following relevant findings:

> That this matter is properly before the Court pursuant to T.C.A. 36-6-306; and,
> That the Court finds that the minor child, Camryne [B.], . . . and the paternal
> grandparents maintained an existing relationship for a period of twelve months
> or more immediately preceding the severance of the relationship; and,
>
> That the Court finds that the grandparent and the half sister had frequent
> visitation with the child that is the subject of this suit for a period of not less

5

than one year; and,

That the Court believes that it is in the best interest of the minor child to order grandparent visitation; and,

That the Court is convinced that it is in the best interest of the minor child that she should have visitation with her half sister, [Makenzie], and that little contact should exist between the parties as possible in effectuating this visitation; . . . .

The court went on to order that Grandparents have visitation with Camryne every third weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. as well as telephone contact every other Sunday. Mother and Father were found in willful contempt of the temporary visitation schedule.

## Issues on Appeal

Mother and Father, the appellants, argue that the trial court erred in (1) awarding Grandparents visitation under Tenn. Code Ann. § 36-6-306 and (2) finding Mother and Father in contempt for failure to follow the court's order for temporary visitation prior to the hearing. Grandparents assert that the record on appeal is insufficient to allow appellate review and that the appeal should be dismissed.

## STANDARD OF REVIEW

In an appeal of a decision rendered after a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Moreover, we "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

## ANALYSIS

### 1.

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170,

174 (Tenn. 1996). Consequently, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our Supreme Court has held that the need to protect a child from substantial harm constitutes a compelling state interest sufficient to justify interference with parental decisions. *See Hawk v. Hawk*, 855 S.W.2d 573, 582 (Tenn. 1993); *Hale v. Culpepper*, No. M2002-01955-COA-R3-CV, 2003 WL 22994294, at *4 (Tenn. Ct. App. Dec. 22, 2003) (discussing *Hawk*). The United States Constitution and the Tennessee Constitution prohibit courts from assuming that a relationship between a grandparent and a child always benefits the child. *See Troxel v. Granville*, 530 U.S. 57, 66-72 (2000); *Hawk*, 855 S.W.2d at 577, 581-82.

Tennessee Code Annotated section 36-6-306(b)(1) provides:

In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:
(A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;
(B) The grandparent functioned as a primary caregiver such that cessation of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or
(C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.

Tennessee Code Annotated section 36-6-306 was amended in 2000 to include the threshold requirement that there be a danger of substantial harm to the child. Tenn. Code Ann. § 36-6-306(b)(1); *see Culpepper*, 2003 WL 22994294, at *5. It is only after there has been a finding of a danger of substantial harm to the child that the court proceeds to determine whether grandparent visitation is in the child's best interests. Tenn. Code Ann. § 36-6-306(c). The burden of proof is on the grandparents to show a danger of substantial harm. *See McGarity v. Jerrolds*, 429 S.W.3d 562, 573 (Tenn. Ct. App. 2013).

Although the circumstances that constitute substantial harm cannot be precisely defined, this court has offered the following guidelines:

[T]he use of the modifier "substantial" indicates two things. First, it connotes

7

a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted) (quoted with approval in *McGarity*, 429 S.W.3d at 573; *Culpepper*, 2003 WL 22994294, at *7). Moreover, "[t]o find substantial harm, there must be supporting evidence in the record that is specific to this child's relationship with this grandparent." *Green v. Evans*, No. M2001-00276-COA-R3-CV, 2012 WL 1107887, at *11 (Tenn. Ct. App. Mar. 30, 2012); *see Angel v. Nixon*, No. M2010-00554-COA-R3-CV, 2010 WL 4483915, at *3 (Tenn. Ct. App. Nov. 8, 2010). For an appellate court to affirm a trial court's finding of substantial harm, "there must be affirmative evidence in the record showing that the specific child at issue is likely to suffer substantial harm from the loss of the grandparent-grandchild relationship." *McGarity,* 429 S.W.3d at 577.

In the present case, the trial court failed to adhere to the required statutory analysis. There was no finding that there was a danger of substantial harm to Camryne. Rather, the trial court based its decision largely upon the need to maintain the relationship between Camryne and her half-sister, Makenzie, a consideration not authorized under Tenn. Code Ann. § 36-6-306. Moreover, the record in this case does not contain evidence that Camryne was in danger of substantial harm due to the cessation of the relationship with Grandparents.[2] Mother and Father presented evidence that Camryne is a well-adjusted child who was not suffering serious emotional harm and that Mother and Father had sound reasons for terminating her relationship with Grandmother. To order grandparent visitation without a finding of substantial harm violates Tenn. Code Ann. § 36-6-306 and the fundamental right of parents to raise their children as they see fit. *See Troxel*, 530 U.S. at 66-72; *Hawk*, 855 S.W.2d at 577-82.

2.

The other issue that needs to be addressed is the trial court's contempt finding against Mother and Father.

In its April 7, 2014 final order, the trial court held Mother and Father in contempt for

---

[2]Grandparents' argument that the record on appeal is incomplete fails. The only missing item they identify is a transcript of the meeting that occurred in chambers between the trial court and Makenzie, and the attorneys for both sides. Grandparents neither claim that a transcript of this meeting exists nor assert any reason that it would bear on the issue of a danger of substantial harm to Camryne due to the cessation of a relationship with them.

failing to allow Grandparents visitation with Camryne pursuant to a temporary order (dated January 10, 2014) that was in place pending the final hearing in this matter. They were ordered to spend ten days in jail for this contempt, but execution was stayed pending their compliance with the court's order.[3]

We review a trial court's decision to impose contempt sanctions under the abuse of discretion standard. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). A trial court abuses its discretion when "'it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). We review the trial court's factual findings with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Konvalinka*, 249 S.W.3d at 357.

Awarding Grandmother visitation with Camryne pending the final hearing, the trial court did not make the findings necessary under Tenn. Code Ann. § 36-6-306. Mother and Father were opposed to the visitation. Without a finding of substantial harm, the court could not constitutionally order visitation with Grandmother. *See Hawk*, 855 S.W.2d at 582. Therefore, the court applied an erroneous standard in awarding visitation to Grandmother and abused its discretion in imposing contempt sanctions for violation of the temporary visitation order.

CONCLUSION

The judgment of the trial court is reversed. Costs of the appeal are assessed against the appellees, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[3]In light of the fact that this Court has reversed the trial court's order of April 7, 2014, Mother and Father are unable to be in "compliance" with that order.

9